W. R. FULLARTON, Appellant, v. J. J. McCAFFREY, Appellee.

ELECTIONS: Ballots—Identified Ballots—Official Card of Instruc-
1  tions—Evidence. The official card of instruction is not admissible in evidence on the issue whether a ballot was "identified." (Sec. 1111, Code, 1897.)

ELECTIONS: Ballots—Identified Ballots—Intention to Identify—
2  Evidence. The ballots are the only evidence of what was intended by any mark placed thereon by the voter. (Sec. 1120, Code Supp., 1913.)

**ELECTIONS:    Ballots—Identified Ballots—Rules to Determine.** An unauthorized mark on a ballot, in order to constitute an invalidating identification mark, must be made *designedly* and for the *purpose* of indicating who cast it. *With careful regard not to disfranchise an honest voter*, and keeping in mind the manner in which the ordinary voter proceeds, other material considerations are:

1. Is the mark reasonably adapted to identifying purposes?

2. What relation, if any, does the mark bear to other marks on the ballot?

3. What similarity is there between the ballot in question and other ballots cast?

4. Does the mark so *single out and separate* the ballot from others that the court can fairly say that it was probably made *for that purpose?*    (Sec. 1120, Code Supp., 1913.)

PRINCIPLE APPLIED:

Marks that identify:

1. The remnant of a perpendicular line within a square, after an attempted erasure, with a light pencil mark drawn around it, in the form of a letter "C."

2. A square, *on six different ballots*, marked full with lead pencil marks, so as to color it to the lines—a solid colored square.

Marks that do not identify:

1. A retraced square.

2. A soiled mark (within a square), *difficult to describe*, but probably made in an attempt to erase a cross.

3. A soiled mark, clumsily made in and about a square in an attempt to erase something, followed by the insertion of a distinct cross in the same square.

4. A barely distinguishable remnant of a cross in the square before contestant's name, after an attempted erasure, with a distinct cross in the square before incumbent's name.

5. A straight line on *three* different ballots in the square before incumbent's name, one line wholly unerased, the other two partly erased, with a distinct cross on all three ballots in the square before contestant's name.

6. An erasure of something in a square before the name of a candidate for an office not involved in the contest in question.

7. Skillfully and unskillfully made erasures *on some 40 different ballots*, of something in the square before incumbent's name, with a distinct cross in the square before contestant's name.

8. Erasures, some neatly and some slovenly made, *on some 130 different ballots*, of a cross in the square before incumbent's name, with a distinct cross in *heavy lines* in the square before contest-

66       FULLARTON V. McCAFFREY.          [177 Iowa

ant's name, the heavy lines being made, probably, with a moistened pencil.

**ELECTIONS:** Ballots—Identified Ballots—Erasures. Erasures, of themselves alone, do not necessarily indicate that they were done . *designedly* and with intent to identify the ballot. (Sec. 1120, Code Supp., 1913.)

**ELECTIONS:** Ballots—Identified Ballots—Unsuccessful Erasure of Cross—Effect. Faint and almost indistinguishable remnants of a cross in the square before a contestant's name, remaining after an attempted erasure, with a distinct cross in the square before incumbent's name, do not constitute an identifying mark, especially where the entire series of ballots revealed numerous instances of , the same kind. (Sec. 1120, Code Supp., 1913.)

**ELECTIONS:** Ballots—Dual Marking—Erasure—Effect. Marking crosses in squares opposite the names of more than one candidate, where only one is to be elected, followed by the erasure of one of the crosses until only a *barely distinguishable remnant thereof remains*, does not destroy the validity of the ballot for the candidate whose cross stands wholly unerased, especially where the entire series of ballots in question revealed many instances of the same kind. (Sec. 1120, Code Supp., 1913.)

*Appeal from Dubuque District Court.*—ROBERT BONSON, Judge.

THURSDAY, JUNE 29, 1916.

CONTESTANT was an independent candidate for the office of coroner of Dubuque County at the general election of 1914, and the incumbent, the regularly nominated candidate on the democratic ticket. The latter was declared elected, by the board of supervisors, whereupon a contest was instituted and the incumbent declared elected, by the court of contest. Contestant appealed to the district court, which, on hearing, found the incumbent to have been elected. Contestant appeals.— *Reversed.*

*Hurd, Lenehan & Kiesel,* for appellant.

*Nelson & Duffy,* for appellee.

Ladd, J.—I. The parties hereto were rival candidates for the office of coroner of Dubuque County. Four candidates contested for the democratic nomination at the primary, but no one received 35 per cent. of the vote cast. McCaffrey was nominated at the county convention and Fullarton became an independent candidate, having his name put on the ballot by petition. In the 34 precincts, 3,999 ballots were marked for McCaffrey and 3,848, for Fullarton. None of these are in dispute. Besides these, there were 203 ballots. Of these, the contestant offered 188 in evidence. To each of these, incumbent objected, for that "it contained marks of identification, erasures, is defaced and shows marks in squares opposite more than one name for coroner." Five ballots were offered in evidence by the incumbent, to which various objections were interposed, and ten ballots were not offered by either party. By stipulation, the original ballots in dispute have been certified to this court for inspection. Two questions are involved: (1) Whether crosses appeared in more than one square before a candidate for coroner, and (2) whether any of the ballots bore identifying marks. Before passing on these objections to the several ballots, the statutes bearing thereon may as well be referred to.

Under the Australian ballot system, the elector is provided with a ballot by one of the judges of election, and he can make use of no other, and this he prepares "by placing a cross in the square opposite the name of each candidate for whom he desires to vote." Section 1119, Code Supp., 1913.

"When only one candidate . . . is to be elected, if the voter marks in squares opposite the names of more than one candidate therefor, such vote shall not be counted for such office. . . . If for any reason it is impossible to determine the voter's choice for any office to be filled, his ballot shall not be counted for such office. Any ballot marked by the voter in any other manner than as authorized in this chapter, and so that such mark may be used for the purpose of

identifying such ballot, shall be rejected." Sec. 1120, Code Supp., 1913.

"Any voter who shall spoil his ballot may, on returning the same to the judges, receive another in place thereof, but no voter shall receive more than three ballots, including the one first delivered to him." Sec. 1121, Code Supp., 1913.

The attorney general is required by Section 1111 of the Code to prepare a card of instructions, and copies of this are caused to be printed and posted in the several voting precincts of the state. These, it seems needless to say, do not supersede the statutes, but are intended to guide the voter, and especially to enable him to avoid any mistake in expressing his choice, and prevent him from loading his ballot with identifying marks. Thus in the "Card of Instructions" issued, voters were warned that "any erasure or identification marks, or otherwise spoiling or defacing a ballot, will render it invalid," and directed what to do in such event. Of course this is not correct in all cases, but the voter is not ordinarily well enough informed to say what will be deemed an identifying mark, and the only safe course for him to pursue is to surrender such a ballot and avoid any chance of having his vote rejected. But whether any of these, as they appear on the ballot, constitutes an identifying mark is not to be determined from the card of instructions, and the card had no place in the evidence. The ballots necessarily are the only evidence of what was intended by anything placed thereon by the voter, and it is often difficult to determine whether any particular mark was designed or might be used for identification as the ballot of the person casting it. As said in *Whittam v. Zahorik*, 91 Iowa 23:

1. ELECTIONS: ballots: identified ballots: official card of instructions: evidence.

2. ELECTIONS: ballots: identified ballots: intention to identify: evidence.

"It will not do to say that all ballots which bear marks not authorized by law should be rejected. All voters are

not alike skillful in marking. Some are not accustomed to using a pen or pencil, and may place some slight mark on the ballot inadvertently, or a cross first made may be clumsily retraced. It is evident that in such cases, and in others where the unauthorized mark is not of a character to be used readily for the purpose of identification, the ballots should be counted, but where the unauthorized marks are made deliberately, and may be used as a means of identifying the ballot, it should be rejected.''

In *Voorhees v. Arnold,* 108 Iowa 77, Granger, J., speaking for the court, said:

''The unauthorized marks, to be identifying, must be deliberately made, as we said in the Whittam case, and not be merely accidental, or the result of inexperience in the use of pen or pencil, or a mere effort to correct what may be thought to be an improper marking. . . . On some of the ballots in this case, where there is a wide departure from the legal requirements, we may safely say that the unnecessary marks could not be used for identification, because the maker could never describe them to another so far as to permit of their use for that purpose. In other cases, it is doubtful whether they could be so used or not. In such cases, the question is one of fact for the jury, because there might reasonably exist differences of opinion as to the fact. In such cases, the ballot should be put in evidence, and the jury permitted, under instructions, to determine whether there has been a deliberate departure in the marking, and in a way that it might be used to identify the ballot.''

In *Kelso v. Wright,* 110 Iowa 560, it was observed that:

''What constitutes an identification mark upon a ballot is generally a question of fact for the trial court, and its finding, or the finding of the jury, if the case is submitted to a jury, is conclusive on appeal.''

See also *Morrison v. Pepperman,* 112 Iowa 471; *Spurrier v. McLennan,* 115 Iowa 461.

The distinguishing mark prohibited by law is one which will enable a person to single out and separate the ballot from others cast at the election. It is something done to the ballot by the elector designedly and for the purpose of indicating who cast it, thereby evading the law insuring the secrecy of the ballot. In order to reject it, the court should be able to say from the appearance of the ballot itself that the voter probably changed it from its condition when handed to him by the judges of election, otherwise than as authorized, for the purpose of enabling another to distinguish it from others. The law does not contemplate that the elector will see his ballot after it is cast. The design of the Australian ballot law is not only to free the voter from intimidation, by making his way of voting known only to himself, but to close the door securely, as nearly as human ingenuity can, against making merchandise of his vote. As said in *Sego v. Stoddard,* 136 Ind. 297 (22 L. R. A. 468):

3. ELECTIONS: ballots: identified ballots: rules to determine.

"The idea was not, as appellant's counsel seem to think, to so provide as to render it impossible for the purchased or bribed voter to afterwards identify the ticket he voted by looking at and inspecting it, because the other provisions of the act provide for a destruction of the ballots after they are counted, and before anybody except the officers can see them; but it was to guard against the possibility of the vote seller's indicating to the buyer in advance how his ballot would be distinguished from the other ballots in the box, so that the buyer or his agent, who may be one of the election officers, could tell, when the bribed voter's ballot was reached in the count, that such bribed voter had carried out his contract. It was believed that, if it could be rendered impossible for the buyer or his agent to identify the ballot voted by the purchased voter from a mere indication beforehand how it should be marked, the desired end would be reached; because it was believed that, as a general thing, a vote buyer would not risk his money on a vote seller without

some assurance other than the mere word of the bribed voter.''

See also *Winn v. Blackman*, 229 Ill. 198 (82 N. E. 215).

But in guarding the secrecy of the ballot, it was not the design of the law to disfranchise the honest voter. Though intended to purge elections of bribery, corruption and fraud, this ought to be accomplished without preventing the fair expression of the will of the electors of the state. The law, then, should be so construed, if possible, as to eliminate the evils mentioned, without interfering further than essential with the privilege of voting, as likely to be exercised by electors generally, acting honestly under existing statutory regulations. Some of the earlier decisions, rendered shortly after the enactment of the Australian ballot law in the several states, are somewhat extreme in applying that portion relating to identifying marks, going, as we think, to the verge of infringing on the free exercise of the voting franchise; but these may be explained, if not justified, by the supposed prevalence of corrupt practices at elections prior to such enactment and the laudable purpose of efficiently applying the remedy. Subsequent experience has disclosed how the ordinary voter proceeds under regulations in preparing his ballot, and many of the marks at first denounced as evidencing a corrupt purpose are now thought to be due to carelessness, accident or inadvertence. What is an identifying mark is not defined in our statute, and whether any mark on a ballot other than the cross authorized to be placed thereon was intended as a means of identifying such ballot must be determined from the consideration of its adaptability for that purpose, its relation to other marks thereon, whether it may have resulted from accident, inadvertence, carelessness or evidenced design, and the similarity of the ballot with others cast and the like. In other words, the court, in deciding the issue as to whether the ballot has been marked so as to be identified by another, may and should consider all the evidence and circumstances bearing thereon, precisely as in pass-

ing on any other issue. Electors are not presumed to have acted corruptly, and identifications only which may fairly be said to be reasonably suited for such purpose and likely to have been so intended will justify the rejection of the ballot. *Bartlett v. McIntire,* 108 Me. 161 (79 Atl. 525); *Parker v. Hughes,* 64 Kans. 216 (67 Pac. 637); *Howser v. Pepper* (N. D.), 79 N. W. 1018; *Coughlin v. McElroy,* 72 Conn. 99 (43 Atl. 854); *Church v. Walker,* 10 S. D. 450 (74 N. W. 198); *State v. Fawcett,* 17 Wash. 188 (49 Pac. 346).

II.  Reverting now to the ballots before us, we may first consider the five to which contestant objected. In Exhibit "B," a perpendicular line had been drawn in the square before the name of the candidate for secretary of state on the democratic ticket and then erased, and a light pencil mark· extended down around it to the lower corner at the left side, in the form of the letter "C." This might readily have been described to another, must have been deliberately made, and was well adapted for identification. We are of the opinion that the ballot should not have been counted. In Exhibit "D," the lines of the cross in the square before incumbent's name evidently had been retraced. The ballot was rightly counted for incumbent. *Whittam v. Zahorik,* supra.

The objection to Exhibit "G" was that the mark in the square before the name of Hollingal, candidate for township trustee on the democratic ticket, might be used for the purpose of identification. The elector had made a cross and then appears to have undertaken to erase it with a soiled rubber or wet finger or thumb. Probably, after marking, he observed the name, and, not wanting to vote for the candidate, undertook to remove the cross, after having made it, or upon changing his mind. The condition is not easy to describe, nor one likely to have been caused for the purpose of identification, and we are inclined to concur with the trial court in finding that the ballot should be counted.

In Exhibit "K," some mark had been attempted to be erased in the square before incumbent's name, and there-

after a cross was distinctly inserted therein. The attempted erasure was in and about the square, clumsily done, with hands not too clean; but the mere fact that an erasure is not successfully or neatly done does not indicate that it was designedly done, with the intention of identifying the ballot. Electors will erase in event of mistakes, notwithstanding cards of instructions, and undertake to correct for themselves, and courts should recognize this inclination or tendency, in passing on the question as to whether what was done was meant to be used as a means of identification. There was no error in counting the ballot.

4. ELECTIONS: ballots: identified ballots: erasures.

Exhibit "M" had a cross in the square before incumbent's name, and when offered by him, was objected to for that, as was claimed, there was also a cross in the square before contestant's name. The elector had made a cross in the square before contestant's name, attempted to erase, and had succeeded in so far as to leave a mere trace of the lines, so that they are barely distinguishable to the eye. In the face of this manifest effort to erase the lines, evidently inadvertently or accidentally drawn, or erased owing to change of mind, it ought not to be said that these tracings constitute a marking of the ballot or an identifying mark, but should be held that the attempt was merely to eradicate such lines and to mark the ballot for incumbent only. What he did refutes any inference of any purpose of voting for both candidates for the same office, and it cannot be said that this was done designedly, for the purpose of identification. Quite naturally a person would think that such a mistake could be corrected as this was done, and that he did so, as we think, casts no doubt on his good faith in what he did. Moreover, the circumstance that a large number of the ballots contained similar erasures either of marks in the square before the name of incumbent or in the square before

5. ELECTIONS: ballots: identified ballots: unsuccessful erasure or cross: effect.

6. ELECTIONS: ballots: dual marking: erasure: effect.

the name of Egelhof, candidate on the progressive ticket, indicates strongly that the mark was made inadvertently or carelessly or accidentally, and that the voter, in undertaking to erase the same, was not trying to identify his ballot, but to correct it. This, with the three ballots previously considered, should be counted.

The contestant offered 188 ballots. Of these, six were marked by a cross in the square before contestant's name, and the square before incumbent's name was marked full by lead pencil, so as to color it to the lines. This was well calculated to serve as a mark of identification. A glance would have been sufficient to apprise anyone of its condition, and that this was deliberately done by the elector cannot be doubted. These were rightly rejected.

In one ballot, there is a straight mark in the square before incumbent's name, with no attempt to erase; while in two others at least, the electors attempted to erase such mark. Evidently the voter made this without observing the name of the candidate, and immediately went across to that of contestant. We are not inclined to regard these marks as intended for identification of the ballots. In one ballot, there was an erasure of something in a square opposite the name of a candidate for justice of the peace, and the paper was somewhat soiled. We do not regard this as intended to identify. It is merely an erasure which the voter thought himself entitled to make, in order to avoid voting for that candidate. In about 40 of the remaining ballots, some mark appears to have been made in the square before incumbent's name, and to have been entirely erased. This was done sometimes neatly and evidently with a rubber, and at other times by the use of the hand or otherwise, but so as to completely obliterate the lead pencil marks. In most instances, the paper was soiled. That done evidently was for the purpose of removing some mark which might, if not removed, have indicated a purpose to vote for incumbent. In every instance, the cross in the square before the contestant's name was distinct. Evidently,

in marking the squares of the democratic county ticket, the voter had marked the square with his right hand, and by impulse and in going down the line, had placed, or started to place, a cross in the square before incumbent's name, and, upon discovering the mistake, had erased this and passed over to the independent column and voted for the contestant. As previously indicated, we are not inclined to regard such erasures, which, in all reasonable probability, were honestly made, and are so little suited for the purpose, as marks of identification. In each of more than 130· of the ballots, a cross had been made in the square before incumbent's name and then erased, and a cross in heavy lines inserted in the square before contestant's name, as though, after the erasure, the pencil had been wet before drawing the lines. In every instance, the cross before incumbent's name was so completely erased that merely the trace of the lines is perceptible. Most of the erasures appear to have been neatly effected by the use of a rubber; though in some instances, the paper is more or less soiled. The condition of the erasure and the cross drawn before contestant's name strongly emphasizes the purpose of the elector to cast his vote for contestant only, and in the face of what we know was intended, we are not ready to regard the mere traces of the lines in the square before incumbent's name as marks, such as contemplated by statute. The elector conclusively demonstrated his purpose to obliterate the cross there; and, in view of the condition of the ballot, should be held to have accomplished his purpose. As previously suggested, the mistake in inserting the cross before incumbent's name was probably owing to the impulse in following the squares down on the democratic ticket, and drawing the lines before observing the candidacy, and, upon observing, erasing the same, as one naturally would, and then moistening the pencil and making the mark where desired. This inference finds support in the large number of ballots appearing in the same condition, and we are abidingly convinced that what was done by this large number of electors was with-

out thought of identification, and with the design only of voting for the candidate of their choice, and that these ballots should have been counted for contestant. Some other ballots are claimed to bear identifying marks; but, as they are not the subject of argument by either party and cannot change the result, they are not considered. Contestant should have been declared elected.—*Reversed.*

EVANS, C. J., GAYNOR and SALINGER, JJ., concur.