430

WAYNE HEADINGTON et al., appellants, v. NORTH WINNESHIEK COMMUNITY SCHOOL DISTRICT et al., appellees.

No. 50725.

(Reported in 117 N.W.2d 831)

November 13, 1962.

Miller, Pearson & Melaas, of Decorah, for appellants.

Elwood, Anderson & Elwood, of Cresco, for appellees.

Snell, J.—This is an action in equity challenging the declared result in a school bond election.

Plaintiffs-appellants are taxpayers and electors residing in North Winneshiek Community School District in Winneshiek County.

The school district, its directors and officers are defendants.

In April 1961 the district held an election and submitted the following proposition to the voters:

"Shall the following public measure be adopted?

"Shall the North Winneshiek Community School District in the County of Winneshiek, State of Iowa, issue School Bonds in a sum of not to exceed $400,000.00 for the purpose of building and furnishing a new school building and procuring a site therefor?"

The Election Judges reported the returns as follows:

> 740 votes cast
> 442 affirmative votes
> 287 negative votes
> 11 spoiled ballots

On the basis of this count the proposition received an affirmative vote of more than 60%.

In the trial court plaintiffs contended that the election was not conducted as required by law in several particulars and that certain affirmative votes were improperly counted and negative votes improperly rejected. The facts and exhibits were introduced by stipulation and deposition.

The trial court in a careful analysis of the evidence and the law found that the election was lawfully conducted and that the public measure carried by the 60% required by law.

For reversal plaintiffs urge seven propositions. These will be considered in order.

I. It was stipulated that there were four precincts and voting places within the district in the last general election. At the election now under attack there was only one polling place. Plaintiffs contend this makes the election illegal and void.

Burr Oak is a village within the district.

Section 277.5, Code of Iowa, provides:

"Precincts for voting. School corporations other than city, town, or village independent, or community districts shall constitute a voting precinct, but the voting precincts at all school elections in corporations in whole or in part in cities, towns, and villages shall be the same as for the last general state election except that the board may consolidate two or more such precincts into one unless there shall be filed with the secretary of the board, at least twenty days before the election, a petition signed by twenty-five or more electors of any precinct requesting that such

precinct shall not be consolidated with any other precinct. To such petition shall be attached the affidavit of a qualified elector of the precinct that all the signers thereof are electors of such precinct, and that the signatures thereon are genuine."

Section 277.7, Code of Iowa, provides:

"Polling place. In all school corporations the board shall determine a suitable polling place in each precinct, which polling place shall be, when practicable, the same place used by the last city or state election."

Page 4 of the minute book of the Board of Directors shows in pen written form the proceedings of a regular meeting on March 14, 1961. Page 5 continues with the minutes of a special meeting immediately following. From these minutes, we quote:

"March 14, 1961—Special Meeting

"At the conclusion of the regular meeting, a special session was called to order at which time the necessary petitions for a bond election were presented to the Board with a total of 338 signatures.

"Marlow made a motion that the bond election be held on April 17, 1961, this motion seconded by Peterson. Carried.

"The Van Vliet schoolhouse—formerly Hesper #4 was designated as the voting place." * * *

"Also attached hereto and officially made a part of these minutes is a typewritten transcript of the official minutes, resolutions and proceedings of the Board of Directors held on March 14, 1961."

The attached record is typed and signed. It sets out the proceedings, resolutions and directions incident to the election. The resolution provides for an election for the submission of the proposed bond issue. It provides, among other things:

"WHEREAS, the entire School District constitutes one voting precinct for School Election purposes: * * *

"BE IT FURTHER RESOLVED, that the voting place for said Election shall be as follows:

"Van Vliet School, formerly Hesper No. 4."

The record shows the aye and nay vote and the adoption of the resolution by unanimous vote.

There is no contention that there was any petition signed by 25 voters and filed with the secretary opposing consolidation of voting precincts as authorized by section 277.5 of the Code.

No discussion of applicable law is necessary. Consolidation of voting precincts is authorized by statute in the absence of a statutory protest. The pen written minutes and the typed and signed resolution effectuated a legal consolidation of voting precincts.

■ ■ II. Plaintiffs contend that the judges of election were not selected in the manner required by section 277.10, Code of Iowa, and the departure was such as to render the election void.

Section 277.10 of the Code provides in part:

"Judges of election. In corporations consisting of one voting precinct the president and the secretary of the board, with one of the directors shall act as judges of the election. If any such judge of election is absent or refuses to serve, the voters present at the polls shall appoint one of their number to act in his stead."

As we have held in Division I, supra, that there was only one voting precinct we quote only the provision relative thereto.

The minutes of the board meeting on March 14, 1961, show the selection of four judges, two substitute judges, three clerks and one substitute clerk. None of those selected was a member or secretary of the board.

The pollbooks show that three of the selected judges and the three selected clerks qualified as such, served and signed the official returns. The record is silent as to the fourth person selected to serve as judge. Apparently she did not appear. One of the ladies selected as substitute judge did not appear. Her husband appeared, took the required oath, served and signed the pollbooks as one of the four judges.

It is apparent that neither the selection nor the serving of the election officials was in strict compliance with the statute.

As to one-precinct districts there is no provision in section 277.10 for more than three judges or for any clerks. Neither is there any limitation. There being no statutory prohibition and no showing of fraud or prejudice extra help at the polls by qualified electors duly sworn does not vitiate an election.

In Mack v. Independent School District of Corning, 200 Iowa 1190, 1191, 206 N.W. 145, the entire board, in addition to the president and secretary, were chosen as judges of the election. On appeal we said:

"By reason of this fact, the appellants urge that the election was void. To our minds this is merely an irregularity, at most, and would not invalidate the election unless prejudice is shown to have resulted therefrom.

"In so far as the submission of this question to the voters is concerned, and the results determined, there is nothing in the record to show that any prejudice whatever resulted from the fact that all of the members of the board acted at different times as judges of the election."

This case is cited with approval in Poor v. Incorporated Town of Duncombe, 231 Iowa 907, 914, 2 N.W.2d 294.

In Chambers v. Board of Directors, 172 Iowa 340, 345, 346, 154 N.W. 581, 583, it is said:

"While the law seems to provide that the president and secretary and one of the board shall act as judges of election (Code, Sec. 2746), the judges who were selected were at least *de facto* officers, and the election should not be invalidated because of irregularities in the manner of their selection. The rule universally adopted is that irregularities in the selection of election judges will be disregarded unless prejudice be shown. [Citations] If this were not the rule, substance would be subordinated to shadow; and mere technicalities would thwart the will of the people."

Section 277.10, Code of Iowa, provides for the appointment of a substitute if a judge is absent. It appears that one of the selected judges must have been absent. The substitute previously selected was also absent. An elector who was present was sworn and served.

The statute clearly contemplates that there may be vacancies in election personnel and that vacancies should be filled.

There is no claim that the persons who served as election officials were not qualified electors of the district. They were properly sworn. No prejudice is shown. The irregularities in the

selection and serving of the election officials were not such as to affect the validity of the election.

III. Plaintiffs claim, as separate propositions, first, that ballots not initialed at all, and second, that affirmative ballots not properly initialed should not be counted. We will consider these propositions together.

Section 49.82, Code of Iowa, provides:

"Voter to receive one ballot—indorsement by judge. One of the judges of election shall give the voter one ballot and only one, on the back of which a judge shall indorse his initials, in such manner that they may be seen when the ballot is properly folded. No ballot without said official indorsement shall be deposited in the ballot box. The voter's name shall immediately be checked on the registry list."

Section 49.101 provides:

"Defective ballot does not nullify vote. No ballot properly marked by the voter shall be rejected: * * *

"2. Because of any error in stamping or writing the indorsement thereon by the officials charged with such duties."

Six affirmative ballots were not initialed by anyone. Sixty-two affirmative and 35 negative ballots were initialed "J.J.C." These initials did not refer to a judge of election. John J. Courtney was one of the clerks. It seems conceded that he was the person who initialed the ballots in question.

Plaintiffs cite and rely on Kelso v. Wright, 110 Iowa 560, 81 N.W. 805, and with vigor and resourcefulness urge that we overrule the later case of Donlan v. Cooke, 212 Iowa 771, 237 N.W. 496. Plaintiffs support their position with authorities from many other jurisdictions and argue that the Donlan case is unsound. We do not agree. The Kelso case and the Donlan case were decided under different statutes. The Donlan case correctly construes and applies our present statute.

The Kelso case decided under the Code of 1873 holds that a ballot not bearing the indorsement of a judge should not be counted.

The substance of what is now section 49.101, supra, appeared in the Code of 1897 and has been substantially preserved to date.

There is a difference in the wording of the statute since 1931 but we do not consider the change significant.

The Donlan case, decided in 1931, under the Code of 1927, commented that the statute was enacted to meet the situations covered by the Kelso case. The Donlan case, supra, pages 774, 775 of 212 Iowa, squarely holds that ballots uninitialed by a judge of the election should be counted in determining the result.

The Donlan case is sound under our present statute and should be followed.

Plaintiffs argue that even if the six uninitialed ballots are to be counted the 62 ballots initialed by one who was not a judge should be rejected.

With skill and adroitness deserving of greater success than we can grant, plaintiffs attempt to distinguish the Donlan case as it might apply to improperly initialed ballots.

We have been cited to and have found no Iowa case where ballots were initialed by a clerk. We conclude that the reasoning and conclusion in the Donlan case controls here.

As bearing on the reluctance of courts to disfranchise voters because of extracurricular activities of election officials see Cook v. Fisher, 100 Iowa 27, 32, 69 N.W. 264.

18 Am. Jur., Elections, section 225, says:

"It should be remembered, however, that all statutes tending to limit the citizen in the exercise of the right of suffrage are to be construed liberally in his favor, and that the courts are loath to disfranchise voters who are wholly innocent of wrongdoing. As a consequence, it is a firmly established general rule that votes will not be rejected, even though election officers fail to comply with the directory provisions of a statute, if there is no fraud or other irregularity and the failure to comply is unintentional; nor is it material in this connection that the failure of the election officers to perform their duty subjects them to penalties. * * *

"It may, therefore, be stated as a general rule that if ballots are cast by voters who are, at the time, qualified to cast them and who have done all on their part that the law requires of voters to make their voting effective, an erroneous or even unlawful handling of the ballots by the election officers charged with such

responsibility will not be held to disfranchise such voters by throwing out their votes on account of erroneous procedure had solely by the election officers, provided the votes are legal votes in their inception and are still capable of being given proper effect as such. Nor will an election be set aside because of irregularities on the part of the election officials unless it appears that such irregularities affect the result."

29 C. J. S., Elections, section 214, says:

"A substantial compliance with the law regulating the conduct of elections is sufficient, and when the election has been held and the will of the electors has been manifested thereby, the election should be upheld even though there may have been attendant informalities and in some respects a failure to comply with statutory requirements. * * * Voters who have done all in their power to cast their ballots honestly and intelligently are not to be disfranchised because of an irregularity, mistake, error, or even wrongful act, of the officers charged with the duty of conducting the election, which does not prevent a fair election and in some way affect the result. Elections should never be held void unless they are clearly illegal; it is the duty of the court to sustain an election authorized by law if it has been so conducted as to give a free and fair expression of the popular will, and the actual result thereof is clearly ascertained. It has even been held that gross irregularities not amounting to fraud may not vitiate an election."

In the instant case there is no showing of fraud. There is no showing that ballots were improperly handled except that J.J.C. rather than one of the judges initialed 97 ballots. The judges of election must have approved because they accepted the ballots and counted the votes. We are not disposed to disfranchise 97 voters or void the election because of this irregularity.

IV. The trial court found an almost complete disregard of the law in regard to absentee voters and corrected the count of votes accordingly. There is no complaint now based on this correction.

V. Plaintiffs say the ballots were printed on white paper through which the printing and writing could be read and because thereof the election was void.

The ballots were on white paper of ordinary weight and thickness. When open they were five inches by three and seven-eighths inches in size. When marked and folded once it is possible, but not easy to determine, whether the vote was marked "yes" or "no." More than a casual glance is required.

Section 49.49, Code of Iowa, relating to ballots on public measures, provides that all such ballots for the same polling place shall be of the same size, similarly printed, upon yellow colored paper.

Plaintiffs do not urge as a basis for reversal the use of white rather than yellow paper. The purpose of a different color for public measure ballots is to distinguish such ballots from official ballots for candidates for office. At a special election where there is only one ballot the color, if uniform, is not of much importance. McLaughlin v. City of Newton, 189 Iowa 556, 565, 178 N.W. 540.

Section 49.50 provides:

"Indorsement and delivery of ballots. Ballots on such public measures shall be indorsed and given to each voter by the judges of election, as in case of ballots generally, and shall be subject to all other laws governing ballots for candidates, so far as the same shall be applicable."

Section 49.57 provides:

"Method and style of printing ballots. Ballots shall be prepared as follows:

"1. They shall be on plain white paper, through which the printing or writing cannot be read."

The paper used for the ballots in the instant case is difficult to describe. It is of good quality. It is not opaque. Neither is it transparent nor translucent. Whether or not an election official could tell how a ballot was marked would depend on how the folded ballot was handed to the official. If the ballot was turned the right way and scrutinized the mark would show.

Section 49.85, Code of Iowa, provides that one of the judges of election shall at once, after receiving the ballot, in the presence of the voter, deposit such ballot in the ballot box. There is no claim of noncompliance with this statute. Neither is there anything in the record to show complaint by any of the 740 persons

who voted. It is difficult to think that there was any serious infringement on the right to a secret ballot.

29 C. J. S., Elections, section 173(2), says:

"Form and contents in general. Inconsequential irregularities in the form of the ballot do not affect the result of the election, but defects in matter of substance are fatal. Hence, as a rule, failure of the officers charged with the duty of preparing the ballots to follow statutory provisions as to the dimensions thereof, the quality and color of the paper to be used, the character of type and the color of ink to be used in printing them, will not disfranchise the voters who make use of the ballots supplied to them by the election officers. Where the ballots used at an election were those furnished by the election commissioners, the voters of such ballots cannot be disfranchised because such ballots bore words or characters not provided for by statute, or because the paper used was defective. Likewise, where it appears that the words 'official ballot' were written by an election judge by mistake prior to giving the ballots to the voters, such ballots may be counted.

"A statutory provision that ballots not in a prescribed form shall not be counted is mandatory, but if the statute merely provides that certain ballots shall be used, and does not prescribe the result to follow if such ballots are not used, the statutory provision is deemed directory only, so that noncompliance as to the form of the ballot does not necessarily invalidate the ballot, the test of legality being whether or not the voters had an opportunity to express and did fairly express their will. Thus failure to place the words 'official ballot' across the top of the ballot as required by statute will not invalidate an election where it is not provided that such an omission will invalidate the election."

In the instant case the deviation from strict compliance with the statute was without fraud. It was technical rather than real. It was nothing more than a possible failure of compliance with a directory rather than a mandatory statute.

The election was not void by virtue thereof.

VI. Based on depositions showing how certain votes were cast the trial court rejected the votes of nonresidents and ad-

justed the computation accordingly. There has been no complaint relative thereto.

VII.  Plaintiffs claim certain affirmative ballots with identifying marks were improperly counted and negative votes erroneously rejected.

It is provided by statute that the voting mark shall be a cross in the square provided. A ballot marked in any manner than authorized by law or in such a manner as to show that the voter employed such mark for the purpose of identifying his ballot must be rejected. Code sections 49.92 and 49.98.

Plaintiffs attack 45 affirmative ballots as improperly marked or bearing an identifying mark. We have examined all of the ballots certified to us as exhibits. In most instances the objections are hypercritical.

If the objections were to be sustained it would necessarily follow that the same strict rules of exclusion would apply to all ballots with deviations from perfection whether affirmative or negative. Plaintiffs may not object to imperfections in affirmative ballots and ignore comparable imperfections in negative ballots. In this connection we note 33 negative ballots with comparable imperfections.

The judges of election reported 442 affirmative votes. From this total the trial court found, and we agree, there should be deducted four absentee and two nonresident votes, leaving a total of 436 affirmative votes. The judges of election reported 287 negative votes. From this total the trial court found, and we agree, there should be deducted one absentee and one nonresident vote, leaving a total of 285 negative votes.

If plaintiffs' objections to affirmative votes because of imperfection in marking are sustained it would reduce the affirmative votes by 45 to a total of 391. By the same rules the negative vote would be reduced by 33 to a total of 252. The total vote to be accounted for would thus be 643.

Only ballots cast and counted shall be used in computing the total vote cast for and against the proposition. For adoption the proposition required at least a 60% affirmative vote. Section 75.1, Code of Iowa; Dickinson County Memorial Hospital Corp. v. Johnson, 248 Iowa 392, 80 N.W.2d 756.

Sixty percent of 643 is 385.80. If all imperfectly marked ballots are rejected there would remain 391 affirmative votes or more than the 60% required for adoption of the proposition.

By this we do not mean that plaintiffs' objections to the ballots should be sustained. All we mean is that plaintiffs' objections are to no avail.

As recently as December 1960 we said in Beck v. Cousins, 252 Iowa 194, 203, 106 N.W.2d 584, that a distinguishing mark is one which will enable a person to separate and single out a ballot from others cast at the election. We cited and quoted from Fullarton v. McCaffrey, 177 Iowa 64, 158 N.W. 506.

The Fullarton case is probably a landmark for it not only discusses the principles involved but lists marks that identify and those that do not identify.

The opinion quotes on pages 68 and 69 of 177 Iowa, page 507 of 158 N.W., an earlier case in these words:

"It will not do to say that all ballots which bear marks not authorized by law should be rejected. All voters are not alike skillful in marking. Some are not accustomed to using a pen or pencil, and may place some slight mark on the ballot inadvertently, or a cross first made may be clumsily retraced. It is evident that in such cases, and in others where the unauthorized mark is not of a character to be used readily for the purpose of identification, the ballots should be counted, but where the unauthorized marks are made deliberately, and may be used as a means of identifying the ballot, it should be rejected."

The case holds on pages 70 and 71:

"The distinguishing mark prohibited by law is one which will enable a person to single out and separate the ballot from others cast at the election. It is something done to the ballot by the elector designedly and for the purpose of indicating who cast it, thereby evading the law insuring the secrecy of the ballot. In order to reject it, the court should be able to say from the appearance of the ballot itself that the voter probably changed it from its condition when handed to him by the judges of election, otherwise than as authorized, for the purpose of enabling another to distinguish it from others. The law does not contemplate that the elector will see his ballot after it is cast. The

design of the Australian ballot law is not only to free the voter from intimidation, by making his way of voting known only to himself, but to close the door securely, as nearly as human ingenuity can, against making merchandise of his vote. * * *

"But in guarding the secrecy of the ballot, it was not the design of the law to disfranchise the honest voter. Though intended to purge elections of bribery, corruption and fraud, this ought to be accomplished without preventing the fair expression of the will of the electors of the state. The law, then, should be so construed, if possible, as to eliminate the evils mentioned, without interfering further than essential with the privilege of voting, as likely to be exercised by electors generally, acting honestly under existing statutory regulations. * * * What is an identifying mark is not defined in our statute, and whether any mark on a ballot other than the cross authorized to be placed thereon was intended as a means of identifying such ballot must be determined from the consideration of its adaptability for that purpose, its relation to other marks thereon, whether it may have resulted from accident, inadvertence, carelessness or evidenced design, and the similarity of the ballot with others cast and the like."

What constitutes an identifying mark is in most instances a matter of judgment or opinion.

In the instant case most of the objections are based on a less than perfect or customary cross in the square such as "+" rather than "×", lines of unequal length that cross within but not in the center of the square, retraced lines and lines extending beyond the square.

To disqualify the mark must be such as to single out and separate the ballot from others so the court can fairly say that it was probably made for that purpose. Fullarton v. McCaffrey, supra.

Here we have over 10% of the ballots objected to or subject to objection because of minor deviations from perfection. With so many and such a percentage the deviations would be useless for identification.

There are a few ballots marked in such a way or with such emphasis that they should be rejected. No useful purpose would be served by extending this opinion for detailed analysis. The

trial court rejected four absentee and two nonresident affirmative ballots and five as improperly marked or bearing identifying marks. We agree, except we would reject only four as identifiable. The trial court rejected one absentee, one nonresident and five as improperly marked or identifiable negative votes. We agree, except we would reject only four as identifiable. The trial court also properly accepted and counted one negative vote rejected as spoiled by the election judges.

We conclude as did the trial court that the proposition received an affirmative vote of more than 60% of the vote cast.

VIII. Plaintiffs urge that the failure to comply with the statutes governing this election sufficiently eroded its integrity to vitiate it.

While the officials are entitled to no accolade for the many irregularities appearing we cannot say that the election was held for naught.

Greater attention to detail would have avoided many of the attacks made on this election. However, there was no fraud; no corruption; no denial of any right of suffrage; no violation of any mandatory statute.

The vote was honestly counted and with only slight error. It received an affirmative vote of more than 60%.

The case is—Affirmed.

All JUSTICES concur except STUART, J., who takes no part.